UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                    **MEMORANDUM & OPINION**

                    -against-
                                                                    93 CR 1043 (RJD)

KEVIN HAYNES,

                                    Defendant.
------------------------------------------------------X
DEARIE, District Judge.

 Defendant Kevin Haynes, convicted after trial of several crimes relating to his involvement in four bank robberies during an eight-month period from mid-1991 through early 1992, was sentenced in 1994 to 46 years and six months' incarceration.  A full 40 of those years are the mandatory consecutive terms for the two additional 18 U.S.C § 924(c) counts ("stacked" under then-current law) that the government charged in a superseding indictment only when Haynes declined a plea offer and exercised his right to trial.  Haynes now moves under the First Step Act's transformative amendment of the compassionate release statute for order relieving him of the crushing penalty he paid for that choice and reducing his sentence to time served.

 For the reasons to be discussed, the motion is granted.


## BACKGROUND

**A.** **Haynes's Criminal Conduct**

 Haynes, a recently unemployed, 23-year-old father with no criminal history, was recruited by Virgil Rivers, a much older man with a substantial criminal history, to participate with him in four bank robberies, serious criminal conduct that was deserving of serious

punishment.  On July 23, 1991, Rivers entered a Queens branch of Chase Manhattan Bank carrying a handgun and locked down the lobby.  Haynes then entered, also with a handgun, and acted as lookout while Rivers jumped the counter and removed money from the teller drawers. Haynes pointed his weapon at customers and, at one point, directed a bank employee to "put the phone down."  A total of $5,719 was stolen.  The second robbery, of a Brooklyn branch of Bowery Savings Bank on September 13, 1991, was carried out similarly.  Rivers, with his weapon, entered first, followed by Haynes, who again served as an armed lookout while Rivers jumped the counter to access the teller drawers.  A total of $11,250 was stolen.  The third robbery occurred at a Brooklyn branch of Chemical Bank on October 21, 1991.  Again, Haynes was the armed lookout while Rivers took money from the teller drawers (totaling $11,250), but this time Haynes also ordered a customer at gunpoint to open her purse and give him all her money.  Finally, on February 19, 1992, Rivers and Haynes stole $5,382 from a Brooklyn branch of Chase Manhattan Bank.  Although neither displayed a weapon on this occasion, Rivers told the bank employees, "give me your money or I'll blow your brains out."  No one was physically injured during any of these robberies.


**B.**    **District Court Proceedings: Indictment through Sentence**

Haynes was indicted on September 14, 1993 on six counts: conspiracy to commit bank robbery, four substantive robbery counts under 18 U.S.C. § 2113(d) and, although the government knew that guns were used in three of the four robberies, only one firearm count under 18 U.S.C. § 924(c).

By letter dated December 21, 1993, the government conveyed a plea offer to Haynes. The proposed agreement provided for Haynes to plead guilty to one substantive robbery charge

2

(Count Two) and the § 924(c) count (Count Six); the resulting Sentencing Guidelines offense

level on Count Two, according to the government's estimate, was 20 (including the two-level

adjustment for acceptance of responsibility), which corresponded to a sentencing range of 33 to

41 months.  The proposed plea agreement explained that the mandatory five-year term for Count

Six was to be served consecutively to whatever term the Court imposed on Count Two.  Thus,

the government, at that time, would have been satisfied with a sentence between 93 and 101

months (*i.e.*, between 7 years, 9 months and 8 years, 5 months).

>    The December 21, 1993 plea transmittal letter also stated as follows:

>    This offer is conditioned upon the following:  the defendant must inform the
>    government of his intention to plead guilty on or before December 28, 1993 ….
>    This condition will be strictly enforced.  If the defendant fails to meet this
>    condition, the government will seek to obtain a superseding indictment charging
>    the appropriate additional counts under 18 U.S.C. § 924(c).

>    Haynes declined the offer, elected to exercise his right to trial, and within days the

government carried out its threat: a superseding indictment returned on December 29, 1993

added a second and third § 924(c) charge as new Counts Seven and Eight.  Haynes promptly

moved to dismiss the two new counts on the ground that the prosecutorial decision to bring them

in retaliation for his decision to go to trial violated due process.  This Court, bound by the

Supreme Court's decision in Bordenkircher v. Hayes, 434 U.S. 357 (1978), denied Haynes's

motion.  See Dkt. No. 25 (Order dated January 13, 1994).[1]

>    The late Judge Douglas Hillman of the Western District of Michigan, then visiting in this

---

[1] As framed by Justice Stewart's opinion in Bordenkircher, "The question in this case is whether
the Due Process Clause of the Fourteenth Amendment is violated when a state prosecutor carries
out a threat made during plea negotiations to reindict the accused on more serious charges if he
does not plead guilty to the offense with which he was originally charged."  434 U.S. at 358.
The Court's holding answered that question in the negative. Id. at 365.

district, presided over Haynes's trial, where a jury returned a verdict of guilty on all counts.  On June 6, 1994, Judge Hillman sentenced Haynes to a total of 558 months' incarceration.[2]  Terms of 18 months were imposed for robbery conspiracy and each of the four substantive robbery counts, to be served concurrently; and mandatory consecutive terms on the three Section 924(c) counts as follows: 60 months on the first (Count Six) and 240 months (20 years) each on the second and third (Counts Seven and Eight).  As noted at the outset of this opinion, forty additional years in prison were imposed for the two charges that the government brought in direct retaliation for Haynes's decision to go to trial.[3]

Haynes has served almost 27 of the 46 ½ years to which he was sentenced.  To put that in context, he has served *more than three times* the length of the high end of the sentence he would have received had he pled guilty (101 months, or 8 years and five months).  And he still has an additional 13 years to serve.[4]

The contrast between Haynes's fate and that of his codefendant Virgil Rivers is striking.  As noted, it was Rivers, a much older man, with a substantial criminal history including four prior robbery convictions, who recruited Haynes.  See generally United States v. Rivers, 50 F.3d 1126, 1127 (2d Cir. 1995).  Rivers, however, accepted an offer to plead to a single robbery count and a single § 924(c) count.  This Court initially imposed a sentence totaling 17 years and 7

---

[2] The transcript of the sentencing proceeding apparently does not exist.  It is not part of the record assembled as part of Haynes's appeal to the Second Circuit; through inquiries to the Clerk of Court and others, the Court has learned that the court reporter who handled the sentencing is deceased and that his notes are not available, deemed either lost or destroyed in a flood.

[3] The Second Circuit affirmed Haynes's conviction.  United States v. Haynes, No. 94-1109 (2d Cir. Dec. 19, 1994).  This Court denied Haynes's first motion to vacate his conviction pursuant to 28 U.S.C. § 2255 by Memorandum and Order dated November 29, 2004.  Dkt. No. 35.

[4] Haynes is scheduled to be released June 9, 2033.  See Federal Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/. (Haynes is inmate no. 43015-053).

4

months; after the matter was remanded for clarification of certain sentencing factors, see Rivers, 50 F.3d at 1132-33, Rivers was re-sentenced to a total of ten years in prison (consecutive five year sentences on each of the single robbery count and single 924(c) count to which he pled guilty).  See United States v. Rivers, 92-CR-327, Dkt. No. 50 (Amended Judgment) (E.D.N.Y. June 20, 1995).  After his release from prison, Rivers quickly returned to a life of crime: he was indicted in October 2003 and convicted at a 2004 trial of bank robbery and related charges. United States v. Rivers, 03-CR-1120-FB-2 (E.D.N.Y. Sept. 29, 2004) (verdict).  On February 28, 2006 Judge Frederic Block sentenced Rivers to 25 years plus one day.  Id., Dkt. no. 210.  *Despite all this*: Rivers is scheduled to be released *more than eight years earlier* than Haynes.[5]

Equally striking are the contrasts between Haynes's sentence of 46 ½ years and the average sentences imposed on defendants convicted of robbery and other crimes.  Statistics compiled by the United States Sentencing Commission, for example, show that for fiscal year 2019, the average national sentence imposed for the crime of robbery is 109 months (9 years plus 1 month); for murder, 255 months (21 years, 4 months); for child pornography, 103 months (8 years, 7 month); and for "Extortion/Racketeering," 32 months (2 years, 8 months). [6]  For a category labelled "National Defense," which according to the Commission's Sourcebook includes the crimes of "treason, sabotage, espionage, evasion of military service, prohibited financial transactions  and exports, providing material support to designated foreign terrorist organizations, nuclear, biological, and chemical weapons, and weapons of mass destruction," the

---

[5] Rivers is scheduled to be released December 31, 2025.  See Federal Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/. (Rivers is inmate no. 81378-158).

[6] See Table 15, "Sentence Imposed by Type of Crime," https://www.ussc.gov/2019-Annual-Report-and-Sourcebook ("2019 Sourcebook")

average sentence is 42 months (3 years, 6 months).[7]

## C.    Haynes's Requests for *Holloway* Relief

In a comprehensive submission dated January 9, 2017 to the Honorable Robert L. Capers, then United States Attorney for the Eastern District of New York, Haynes implored Mr. Capers to consider what has come to be known as <u>Holloway</u> relief: a motion by the government to vacate one of his § 924(c) convictions that, in turn, would authorize the Court to resentence him. <u>See</u> generally <u>United States v. Holloway</u>, 68 F. Supp. 3d 310 (E.D.N.Y. 2014).  The <u>Holloway</u> decision reflects a consensus understanding that injustice in sentencing can occur even with defendants who have committed serious crimes, and that even when there is no technical defect in a conviction that has resulted in such an unjust sentence, a United States Attorney "can do justice by the simple act of going back into court and agreeing that justice should be done." <u>Holloway</u>, 68 F. Supp.3d at 311.

In his <u>Holloway</u> application to Mr. Capers, Haynes addressed the origin and extent of § 924(c)'s excessive severity, including the Sentencing Commission's report showing that stacked § 924(c) sentences had been disproportionately imposed on Black men like him.  Haynes also discussed the then-growing condemnation of the stacking practice (which would culminate in the First Step Act's elimination of the practice) among members of the United States Sentencing Commission, the Judicial Conference of the United States, the Senate Judiciary Committee and the Department of Justice.  <u>See</u> Dkt. No. 99-3 at 6-9.  Haynes also laid out the basic facts of his case as set forth above and asked Mr. Capers to agree to vacate one of his § 924(c) counts so that he could be resentenced—and finally relieved of the crushing penalty he

---

[7] <u>See</u> 2019 Sourcebook at Appendix A, p. 213.

6

paid for going to trial.

Mr. Capers declined the request.  According to subsequent correspondence from Haynes's counsel, however, it appears that Mr. Capers was sympathetic.  See Dkt. No. 99-3 at 16, 18-21.  That letter—dated May 17, 2018 from Haynes's counsel to the Honorable Richard P. Donoghue, appointed interim United States Attorney for this district in 2018—renews the request for Holloway relief.  The letter reported to Mr. Donoghue that Mr. Capers "appreciated the unfairness of the sentence" but "expressed concerns… including a concern about whether a United States Attorney has the authority to approve the relief" Haynes requested, and sought to address those concerns.  The letter also reported that Mr. Capers believed that the only recourse for Haynes (and which Mr. Capers was inclined to support) was a petition to the President for clemency.

Several months after the renewed Holloway request to Mr. Donoghue, on December 13, 2018, the government and Haynes's counsel appeared before this Court for a conference.  The Assistant United States Attorney expressed the government's doubts about the viability of Rule 48 as a vehicle for post-conviction relief, referenced Haynes's pending application in the Second Circuit Court of Appeals for leave to file a successive § 2255 motion as a reason to defer consideration of compassionate relief, and spoke of the possibility of executive clemency.[10]  In response to the Court's inquiry, the AUSA stated, "Yes.  It is *the position of the Office* that this is not something we should be doing, particularly when there are significant questions about the

---

[10] Pending before the Second Circuit is Haynes's application for leave to file a successive § 2255 petition seeking relief under Johnson v. United States,135 S. Ct. 2551 (2015) and its progeny. As the government is aware, Haynes is unlikely to prevail because, as the government argued in opposition, bank robbery is a crime of violence under the relevant post-Johnson caselaw.  See United States v. Hendricks, 921 F.3d 320 (2d Cir. 2019). It is disingenuous of the government, therefore, to point to that application as possibly affording Haynes relief or as a reason to defer consideration of the present motion.  (Footnote numbers 8 and 9 intentionally skipped).

lawful basis of what the defendant is asking us to do" (Tr. at 10, emphasis added).  These remarks are a matter of record despite the past involvement of the Office in <u>Holloway</u> relief on more than one occasion, including the <u>Holloway</u> matter itself and the Tamil Tiger prosecution before the undersigned.

The Court did not disguise its view of the situation, advising the government that "if there's some sense that this sentence is woefully excessive then there's got to be a way to resolve it" and that the Court was "profoundly disappointed in [the government's]  reaction to this." (Tr. at 10, 11).  The Court remarked that it found the government's position "astounding" and that "this is a problem that has to be corrected." (Tr. at 11).  The Court also asked whether there was at least "a recognition that the sentence imposed is greater than necessary given the legitimate and recognized purposes of sentencing," and the government replied as follows:

> I'm not taking a position one way or the other on the substance of the claim…whether a similar decision would be made now that was made back in 1993…I think it is unlikely that a similar charging decision could be made now, but it is not the position I am in [sic] to reconsider the exercise of prosecutorial discretion made 25 years ago by Assistants and the United States Attorney at the time. (Tr. at 13).

Counsel for Haynes, however, reiterated the position stated in his <u>Holloway</u> letter to Mr. Donoghue.  He conveyed that based on a conversation he had with the then-Chief of the Criminal Division in response to his letter to Mr. Capers, there *was* some recognition on the part of the government that the sentence exceeded the bounds of justice; the disagreement was limited to the question of what the appropriate procedural mechanism for relief might be. (Tr. at 14).

D.       **The Passage of the First Step Act ("FSA")**

The approaching enactment of the First Step Act was of course "in the air" during the December 13, 2018 conference; President Trump signed it into law only eight days later, on

December 21, 2018.  See Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).   Relevant here,

Section 403 of that legislation took the extraordinary step of outlawing the draconian practice of

"stacking" § 924(c) convictions for sentencing purposes in a single prosecution.  See FSA §

403(a), Pub. L. 115-391, 132 Stat. at 5221-22, codified at 18 U.S.C. § 924(c)(1)(C).[11]  The Court

repeats: it was an extraordinary development in American criminal jurisprudence.  A modern-

day dark ages—a period of prosecutorial § 924(c) windfall courts themselves were powerless to

prevent—had come to an end.  (Thus, when the government stated only eight days earlier that it

is "unlikely that a similar charging decision *could* be made now" it was speaking the literal truth;

it remains unclear whether the government was also suggesting that, were the weaponry still

available, it would in fact elect to exercise its charging discretion less aggressively now than 25

years ago).

       The First Step Act of course did not make this critical change to § 924(c) retroactive.  See

FSA § 403(b), Pub. L. 115-391, 132 Stat. at 5222 ("This section, and the amendments made by

this section, shall apply to any offense that was committed before the date of enactment of this

Act, if a sentence for the offense has not been imposed as of the date of such enactment").[12]

Nevertheless, Congress did label the relevant section of the legislation "*Clarification* of

§924(c)."  Id., 132 Stat. at 5521 (emphasis added).  The legal matter of retroactivity aside, the

---

[11] Congress amended § 924(c)(1)(C) in Section 403(a) of the First Step Act "by striking 'second or subsequent conviction under this subsection' and inserting 'violation of this subsection that occurs after a prior conviction under this subsection has become final.'" Pub. L. 115-391, § 403(a), 132 Stat. at 5221-22.

[12] The non-retroactivity is not disputed.  Indeed, as the government correctly notes, in the very next section of the First Step Act, Congress did make *other* changes to sentencing provisions retroactive.  See id. § 404(b), 132 Stat. at 5222 (authorizing courts to "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 … were in effect at the time the covered offense was committed" on motion of defendant).

9

clear message to an individual in Haynes's situation is that *Congress never intended that the brutal sentence he is serving be imposed.*

**E.**     <u>The Rule 48 and Compassionate Relief Motions</u>

On January 7, 2019, Haynes formally moved under Rule 48 of the Federal Rules of Criminal Procedure for an order (i) granting leave for the government to move to dismiss Count 8 of the superseding indictment and (ii) urging the government to exercise its discretion to do so. Haynes argued, in essence, that 28 U.S.C. § 3231's broad grant of original subject matter jurisdiction over criminal offenses vests this Court with some residual jurisdiction to dismiss a final conviction, and that the government may, under Rule 48, move to dismiss counts in an underlying indictment even after a conviction has become final because any implicit time limit in Rule 48(a) is not jurisdictional and thus waivable.  The government staunchly opposed. Without taking a formal position on the scope of its discretion under Rule 48(a) the government simply dug in its heels, stubbornly and inexplicably refusing to exercise that discretion in the interest of remedying the injustice in this case.

At a post-briefing conference on April 26, 2019, the government clung to its hardline position, stating only that "the Office has not filed the Rule 48 dismissal that would trigger the Court's ability to opine on whether it was lawful to do so." (Tr. at 3).  Again, this Court did not mince words, advising the government during that conference that the Court "consider[s] [this] to be a pressing question of fundamental justice.  And to hear this morning that the Office has not filed a motion…just blows me away." (Tr. at 4).  The only concession voiced was that "[i]t is true that other individuals have had Rule 48 dismissals filed by the government in other cases." (Tr. at 5).  The Court voiced that it was "gravely disappointed" in the government's refusal to

10

act.  (Tr. at 5).[13]

With the government persisting in its position that it would not consent to any form of relief in this case, Haynes then advised the Court by letter dated August 6, 2019 of his intention to seek relief under the FSA-amended compassionate release statute.  Dkt. No. 97.  On August 14, 2019, as a preliminary step and consistent with the requirements of 28 C.F.R. § 571.61, Haynes filed a petition with the warden of his facility formally asking that the Bureau of Prisons ("BOP") move this Court on his behalf for compassionate relief pursuant to 18 U.S.C. § 3582(c)(1)(A) on the grounds set forth in his Holloway correspondence to the government and in his Rule 48 motion, attaching copies of those materials to his petition.[14]  BOP's receipt of this request is not disputed.[15]

On the subject of his plans upon release, Haynes referenced his Nurses' Aide Certificate (which he completed while incarcerated) and his then-current enrollment in the Black Stone Career Institute where he was training to become a paralegal.  He noted that, in addition to the possibilities of health care and paralegal work, he could support himself financially in several other ways, including carpentry, construction work, and trucking.

A Summary Reentry Plan Progress Report dated August 13, 2019 and signed by his prison case manager, which was also part of his release petition, documents Haynes's work

---

[13] The Court's grant today of the motion for compassionate relief renders the still pending motion for relief under Rule 48 unnecessary; that motion is therefore denied without prejudice.

[14] 28 C.F.R. § 571.61 provides, in pertinent part, that an inmate initiate his request for a motion on his behalf under Section 3582(c) by filing the request, in writing, with the Warden of his facility, and that the request state the circumstances the inmate considers extraordinary and his proposed release plans.  The government does not dispute the adequacy of petitioner's filing with BOP.

[15] According to Haynes's brief, apparently because of the retirement of the Warden, BOP returned his petition to him.  In an abundance of caution he resubmitted it on September 4, 2019.

assignments, education history, discipline, and other particulars of his long years in prison.  The "Work Assignment Summary" notes that Haynes "has maintained his work assignment as a Unit Orderly since April 2010" and that "[h]e receives outstanding work performance ratings from his detail supervisor."  According to the Report, Haynes took classes in financial planning; microcomputer applications; Microsoft Word, Access and Excel; communications; keyboarding; legal research (twice); movie guide writing; basic mathematics; conversational Spanish; basic Arabic; African-American History; and a course entitled "Initial Prerelease Class."

The section of the Progress Report entitled "Discipline Reports" contains five entries. Three occurred during Haynes' first two years of incarceration, a fourth occurred fifteen years later, and a fifth, five years after that.  They are as follows: February 9, 1994: "interfering with taking count" and "being insolent to staff member;" July 24, 1995: "lying or falsifying statement" and "being in unauthorized area;" December 18, 1995: "encouraging refusal of work;" March 29, 2010: "possessing a dangerous weapon;" and July 9, 2015: "unauthorized physical contact."

After the passage of time required to establish this Court's jurisdiction,[16] on October 3, 2019, without any response from the Warden or BOP, Haynes formally moved this Court for relief under the FSA-amended compassionate relief statute.  Accompanying materials include a letter from the Federal Defenders of New York detailing the support its social work department, experienced with re-orienting released prisoners, would provide Haynes.  According to the letter, upon release Haynes would initially enter the New York City Department of Homeless Services' Men's Intake Shelter in midtown Manhattan and, after intake, would be assigned a permanent shelter.   Initial essentials such as clothing, food, and MetroCards would be provided.  The

---

[16] See note 18, *infra*.

Defenders' social work team would further assist Haynes in the wide range of steps required to begin his new life—from dealing with the Department of Motor Vehicles and Social Security to bona fide job placement assistance.  As the Defenders' letter notes, other local organizations—such as The Osborne Association with an office in downtown Brooklyn—are also committed to assisting individuals re-orient upon release from long prison terms.

When briefing on the motion for compassionate relief complete, the Court offered the government an additional opportunity to reconsider its position, issuing the following order on November 13, 2019:

> Before the Court addresses the issues now thoroughly briefed by the parties, it seems most appropriate that I once again offer the government the opportunity to choose the Holloway path to relief in this case. *See United States v. Holloway*, 68 F.Supp.3d 310 (E.D.N.Y. 2014). I especially urge the government to weigh the circumstances of the case in light of the significant changes in the law detailed in the briefs.

By letter dated February 13, 2020, counsel for Haynes advised the Court that "[a]fter contacting [the government] on February 12, 2020, we understand that the government will not consent to Holloway relief in this case."  Ten days later, by letter-brief dated February 22, 2020, the government confirmed the report from Haynes's counsel.  The letter advised this Court that:

> The United States Attorney has been provided a copy of the Court's November 13, 2019 Order, has reviewed the briefing in this litigation, and has determined that the briefing has revealed no new facts or law that would change the government's position with regard to Haynes's request to dismiss one of his § 924(c)(1) counts of conviction.

The government's February 22, 2020 letter addressed two additional pieces of business. First, the letter reported that, a full ten weeks earlier, the BOP issued a decision on Haynes's petition for compassionate relief.  To the surprise of no one, BOP's action, signed by the facility warden and dated December 6, 2019, was to deny that request.  The government's letter attaches copies of the memorandum prepared by Haynes's Unit Manager for the Warden to consider as

part of Haynes's petition and certain BOP records concerning Haynes, including his BOP inmate profile, sentencing data, and his disciplinary history.  These materials are partially redacted.[17]

The Unit Manager's memorandum references "Program Statement 5050.50, Compassionate Release/Reduction in Sentence," noting that it "provides provisions [sic] for requests based on extraordinary and compelling circumstances," and that what Haynes offered (in his petition) as such circumstances was that "the mandatory minimum sentencing guidelines used to sentence him by the court was [sic] unjust."  The memorandum continues: "Based upon his supporting documentation he is not eligible for a [r]eduction in [s]entence at this time.  No extraordinary or compelling circumstances was [sic] presented…"  Handwritten comments follow these remarks, stating only as follows: "Does not meet criteria" and "no chronic medical conditions that cause difficulty performing activities of daily living."  Length of sentence was not addressed.

The disciplinary record that is part of this package—which was *not* cited by the Warden as grounds for denying Haynes's request for relief—contains the same five disciplinary events listed in the Summary Reentry Plan Progress Report included in Haynes's petition to the Warden with slightly more detail.  The three disciplinary events that occurred in the period 1994-1995 hardly warrant attention; the possession of a dangerous weapon in 2010 and the unauthorized

---

[17] According to the government, the redactions were made "to protect the names of BOP employees from public disclosure, to protect Haynes's personally identifiable information and healthcare information pursuant to Fed. R. Crim. P. 49.1, and to protect certain sensitive information relating to the security and management of BOP correctional institutions."  Counsel for Haynes reports that they asked the government for unredacted copies of these materials and the government refused.  Although they have also asked this Court to direct the government to furnish unredacted materials, that request is denied at this time, without prejudice, as it is not clear that removing the redactions would materially amplify the relevant portion of the factual record or materially influence the Court's discussion of whether Haynes would pose a danger to society.  See *infra* at pp. 33 et seq.

physical contact in 2015, however, form the basis of the government's argument in its February 22, 2020 letter that Haynes would present a continuing danger to the community upon release.

In response, in a letter dated March 12, 2020, counsel for Haynes briefly addresses the 2015 incident. The letter asserts that Haynes restrained a fellow inmate in order to break up a fight among several prisoners, and that facility rules required that he be written up for unauthorized physical contact regardless of the reason. No record materials are included in support of counsel's assertions; as corroboration of sorts, however, the letter emphasizes—as plainly appears on the face of the BOP disciplinary record—that all components of the sanction imposed for this infraction (loss of commissary, phone and visitation privileges) were suspended; counsel asserts that this was because Haynes in fact assisted in minimizing the harm the fight might have caused.

As a "record" on this disciplinary incident, the Court, of course, has before it only the three items just reviewed (the government's February 22, 2020 letter, the redacted BOP disciplinary record, and Haynes's March 12, 2020 letter) and so makes no formal factual findings on the matter. The Court does note, however, that despite the government's hardline position in this matter, it has *not* disputed Haynes's characterization of the 2015 incident.

The other agenda item in the government's February 22, 2020 letter was a citation to the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"). This important statute is hardly new legislation (it became effective in 2004, see Pub. L. No. 108-405, 118 Stat. 2260), and if the government was being genuine one might well wonder why it did not mention CVRA concerns earlier: as noted, Haynes first advised the Court of its intent to move for compassionate relief back in August 2019 and first sought Holloway relief more than three years earlier, in January 2017.

Taking the government at its word, however, the Court understands the letter as alerting the Court that, in the event a hearing were held on Haynes's current motion, the government would seek to locate and notify the victims of Haynes' crimes of their rights under the CVRA to appear. Ostensibly to facilitate following through on this pledge, the government also asks in this letter for 90-days' advance notice of any such hearing. As this memorandum reflects, however, the Court's decision is based on the written submissions, so the CVRA is not implicated.

## DISCUSSION

No reasonable observer could dispute the unfairness and excessiveness of the sentence Haynes is serving. Its length (in absolute and comparative terms, as reviewed above) and the principal reason for that length—the exercise of prosecutorial charging discretion in an oppressive and openly retaliatory manner—speak for themselves. The only relevant legal inquiry has been whether there exists a procedural vehicle *not* dependent on the consent of the government, as in the Rule 48 or Holloway context, through which the Court could lawfully grant Haynes the relief that justice demands. Plainly, as the substantial body of new First Step Act jurisprudence overwhelmingly establishes, that vehicle exists: it is the FSA-amended compassionate release statute.

A.      **The Compassionate Release Framework**

Title 18, United States Code, Section 3582(c)(1)(A)(i), as amended by the First Step Act on December 21, 2018, now provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1)  in any case—

16

> (A)  the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added to reflect amendment).

Thus, as is now well understood, before the First Step Act amended the compassionate release statute, a motion for reduction in sentence based on "extraordinary and compelling reasons" could only be presented to the Court by the BOP on a prisoner's behalf, whereas now, under the amended statute, a prisoner may bring the motion himself, provided the statutory exhaustion or lapse-of-thirty-day requirement is satisfied.[18]

The important legal question presented by Haynes's motion arises from the fact that the First Step Act amended *only* the compassionate release statute and *only* in the manner just noted—*i.e.*, allowing a prisoner, rather than requiring BOP, to be the movant—but did not amend *any other* language in § 3582(c) or *any other* component of the overall compassionate release legal framework as it existed before the First Step Act became law.  That framework, of

---

[18] The Court's jurisdiction over Haynes's motion is not disputed or in question.  As detailed above, he first filed a request with BOP on August 14, 2019 and filed his motion with this Court on October 3, 2019.  BOP's receipt of that request is not disputed.   Nevertheless, in an abundance of caution, after his request was returned (necessarily proof that it was received)— which occurred, he surmises, because the Warden retired—he resubmitted the request on September 4, 2019 and restarted his own waiting period before filing here on October 3, 2019.

17

course, includes a matrix of statutory and other enactments forging a relationship among the

Court, the Sentencing Commission, and BOP.

That framework includes, first, the pre-FSA statute by which Congress delegated to the

Sentencing Commission the authority to determine which circumstances are sufficiently

"extraordinary and compelling" to warrant a reduction in sentence under § 3582(c)(1)(A).  <u>See</u>

28 U.S.C. § 994(t).  That section provides, in relevant part:

> The Commission, in promulgating general policy statements regarding the
> sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall
> describe what should be considered extraordinary and compelling reasons for
> sentence reduction, including the criteria to be applied and a list of specific
> examples. Rehabilitation of the defendant alone shall not be considered an
> extraordinary and compelling reason.[19]

The Sentencing Commission's policy statement implementing these statutory

directives appears in Sentencing Guideline § 1B1.13 (titled, "Reduction in Term of

Imprisonment Under 18 U.S.C § 3582(c)(1)(A) (Policy Statement)").  That pre-FSA guideline

provides as follows:

> *Upon motion of the Director of the Bureau of Prisons* under 18 U.S.C.
> § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a
> term of supervised release with or without conditions that does not exceed the
> unserved portion of the original term of imprisonment) if, after considering the
> factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the
> court determines that—
>
> (1) (A) extraordinary and compelling reasons warrant the reduction; or

---

[19] Indeed, this delegation is a specific instance of the broader delegation of authority set forth in
28 U.S.C. § 994(a)(c)(2), which provides that the Sentencing Commission "shall
promulgate…general policy statements regarding application of the guidelines or any other
aspect of sentencing or sentence implementation that in the view of the Commission would
further the purposes set forth in section 3553(a)(2) of title 18, United States Code, *including the
appropriate use of . . . the sentence modification provisions set forth in … section[ ].. 3582(c)* of
title 18."  28 U.S.C. § 994(a)(2)(C) (emphasis added)

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned.

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G § 1B1.13 (emphasis added).

The "Commentary" to this Guideline includes five "Application Notes." Application Note 1 lists circumstances that qualify as "extraordinary and compelling." Subdivisions (A) though (C) of that Note list the defendant's medical condition, age and family circumstances. Subdivision (D), however, titled "Other Reasons," provides as follows: "*As determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. §1B1.13 App. Note 1 (emphasis added).

Application Notes 2 and 3 (part of the same Commentary) address other substantive standards, providing that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing" in order to qualify (Note 2), and that rehabilitation of the defendant standing alone, does not qualify as extraordinary and compelling (Note 3). Application Notes 4 and 5, however, both speak plainly to the BOP's exclusive gate-keeping authority pre-FSA.  Note 4 states that, "A reduction under this policy statement may be granted *only upon motion by the Director of the [BOP]* pursuant to 18 U.S.C. § 3582(c)(1)(A),"[20] and Note 5 provides that "Any reduction made pursuant to a motion by the Director of the Bureau of

---

[20] Application Note 4 further states that it "encourages" BOP to file a § 3582 motion move if the required circumstances are present and notes that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction…"  U.S.S.G. § 1B1.13 App. Note 4.

Prisons for the reasons set forth in [Application Notes] (1) and (2) is consistent with this policy statement."

Circling back to § 3582(c) itself—as quoted above, although the FSA amended the statute to allow prisoners to seek relief without BOP's blessing, it continues to provide that a court may grant a sentence reduction "if it finds that … extraordinary and compelling reasons warrant such a reduction … *and that* such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).  The heart of the matter before the Court is that many of these policy statements, as just described, not only pre-date the FSA amendment of § 3582(c) but also continue to reference expressly BOP's *pre*-FSA role as exclusive gatekeeper, which of course the FSA eliminated.  See, e.g. U.S.S.G. § 1B.131 ("Upon motion of the Director of [BOP]…); App. Note 1 par. D ("Other Reasons… [a]s determined by the Director of [BOP]").


B.      **The Parties' Positions**

Haynes asks this Court to find that, on the facts presented, the FSA's dramatic amending of § 924(c), though not formally retroactive, is nevertheless an "extraordinary and compelling" circumstance for purposes of relief under the FSA-amended compassionate release statute, 18 U.S.C. § 3582(c).  On the subject of the authority to make this finding, Haynes urges the Court both to follow some of the language in the pre-FSA compassionate release framework and to disregard other language as no longer binding in the face of the FSA's elimination of BOP's gatekeeper role and the Congressional objective of increasing the availability of such relief that the statutory change reflects.

Thus, pointing to Application Note 1 to Guideline § 1B1.13, Haynes argues that the Sentencing Commission, in exercising its Congressionally-delegated authority to expound upon "extraordinary and compelling" by specifically listing age, health and family circumstances ((A) through (C)), also chose to include a catch-all fourth category, "Other Reasons" (Subdivision (D))—which could include *either* reasons "in combination with" *or* "other than" age, health and family. "Other reasons," he says, can include the reasons he advances here.

But, with respect to the language in the same Application Note that vests *BOP* with the authority to determine which "other reasons" qualify, Haynes says that language is inconsistent with the First Step Act's elimination of BOP's gatekeeper role and thus not binding on this Court. To be sure, Haynes's position would be susceptible to the attack that it smacks of a kind of cherry-picking of pre-First Step Act law, or that it is unduly inventive, even reckless, were his position not supported by a substantial body of recent district court decisions (to be discussed momentarily) inaugurating a new jurisprudence of compassionate release. Haynes is not so reckless, however, as to quarrel with the express mandate in § 3582(c)—which the FSA did not amend—that requires, as a component of any order granting a sentencing reduction, that this Court "find[ ] that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." His argument appears to be (although he has not framed it in exactly these terms) that the First Step Act's elimination of BOP as gatekeeper necessarily renders certain of the policy statements still on the books no longer "applicable."

The government's position, naturally, is that the First Step Act merely enacted a procedural change—*i.e.,* identifying who may be the movant under § 3582(c)—but did not alter the substantive standards for what qualifies as extraordinary and compelling, and that Guideline § 1B1.13 and its Application Notes, as written, are binding on this Court unless and until

repealed or declared to be in violation of a federal statute or the Constitution. Thus, the government says that *BOP—but not this Court*—has the authority to decide whether the change in § 924(c) law under the circumstances here is "extraordinary and compelling" for § 3582(c) purposes. Additionally, the government argues, even if the Court did have such authority, an exercise of that authority in Haynes's favor would amount to an impermissible run-around Congress's decision not to make the change in § 924(c) law retroactive.

**C.   Analysis**

**1.   The Court's Authority to Determine What Qualifies As "Extraordinary and Compelling"**

Haynes's position is hardly as radical as it first sounds. As a threshold matter, independent of the apparent conflict between a federal statute (§ 3582(c)) and Guideline commentary exposed here, and conspicuously absent from the government's discussion, there is, as a sort of elephant in the middle of the jurisprudential room, United States v. Booker, 543 U.S. 220 (2005). Booker establishes that the Guidelines and their commentary are unquestionably *not binding* on the Courts.[21]

---

[21] Indeed, even in former days, when "Sentencing Commission commentary that interprets or explains a provision of the Guidelines" was considered "analogous to an administrative agency's interpretation of its own regulations, and [therefore] entitled to controlling weight from the courts unless it violates the Constitution or a federal statute," United States v. Chen, 127 F.3d 286, 290-91 (2d Cir. 1997) (citing, Stinson v. United States, 508 U.S. 36, 45  (1993)), the Second Circuit recognized that "[t]he effect of this rule…is somewhat less certain where the commentary at issue relates to a Guidelines section that mirrors the language of a statute because the Sentencing Commission is not necessarily considered an authoritative source for the interpretation of federal sentencing statutes" id. at 291.

As for the specific issues presented here, the Court enters new jurisprudential territory, to be sure, albeit territory surprisingly well charted.  One of the first decisions studying the relationship between the amended compassionate release statute and the unamended compassionate release policy statements is <u>United States v. Cantu</u>, 423 F. Supp. 3d 345 , 347-48 (S.D. Tex. June 17, 2019) (The "policy statement [in the Guideline commentary] has not been amended since the First Step Act, and some of it now clearly contradicts 18 U.S.C. [§] 3582(c)(1)(A).").[22] Although the defendant in <u>Cantu</u> did not tender the same circumstances offered here as "extraordinary and compelling," the legal issue presented was essentially the same that Haynes's motion presents: "whether the Court, as opposed to the Director of the BOP, can determine that 'there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' [of Application Note 1] and grant relief on that basis." <u>Id.</u> at 350 (quoting, U.S.S.G. §1B1.13 cmt. n.1(D)).  The Court's reasoning warrants restatement here:

> Although Congress empowered the Commission to issue policy statements regarding the appropriate use of the sentence-modification provisions under § 3582, 28 U.S.C. § 994(a)(2)(C), Congress may override the Commission's policy statements by statute.  Because the Commission's statutory authority is limited to explaining the appropriate use of sentence-modification provisions under the current statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority, as they no longer explain an "appropriate use" under the amended statute.  For example, at least one provision of the Commission's previously promulgated policy statement is clearly contradicted by the First Step Act's amendments to

---

[22] Not only has the policy statement not been amended, the Court continued, but "it is also unlikely that there will be a 2019 Guideline manual propagated, as the Commission currently only has two voting Commissioners and requires four voting Commissioners to vote in favor of adoption of a proposed amendment." <u>Id.</u> at n. 1 (internal quotation and citation omitted).  Other courts have made the same observation. <u>See</u>, <u>e.g.</u>, <u>United States v. Webster</u>, 2020 WL 618828, *4 n. 3 (E.D. Va. Feb. 10, 2020).   This Court's own research confirms these facts and that as of the date of this decision, there are no nominations pending.

§ 3582: The unamended policy statement still advises that "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons." … Yet § 3582 allows the Court to grant a motion for extraordinary and compelling reasons upon a motion by the Director of the Bureau of Prisons or by the defendant. … The mandate that the Director of the BOP determine additional extraordinary or compelling reasons likewise fails to explain an "appropriate use" under the newly amended § 3582.[23]

Where two statutes are in conflict, it is nearly axiomatic that the latter enacted is given preference over the former. . . . That principle has especially strong force here where the Commission derives its power to promulgate the policy statement from Congress.  Statutory construction, however, is a holistic endeavor that must consider the entire statutory scheme. … The Court's role is to make sense rather than nonsense out of the corpus juris….The corpus juris here consists of the statute (18 U.S.C. § 3582(c)), the relevant policy statement (U.S.S.G. § 1B1.13), and the statute granting the Commission authority to promulgate that policy statement (28 U.S.C. § 994).

Before the First Step Act's amendments to § 3582, it made sense that the BOP would have to determine any extraordinary and compelling reasons—only the BOP could bring a motion for a reduction of sentence under § 3582(c)(1)(A).  But defendants no longer need the blessing of the BOP to bring such motions. The BOP in fact may never weigh in or provide guidance when a § 3582(c) motion is brought by a defendant. . . . Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

The title of the First Step Act section that amends 18 U.S.C. § 3582(c)(1)(A) … is "Increasing the Use and Transparency of Compassionate Release." … That title supports the reading that U.S.S.G § 1B1.13 cmt. n.1(D) is not applicable when a defendant requests relief under § 3582(c)(1)(A) as amended because it no longer explains an appropriate use of that statute.  *For if the Director of the BOP were still the sole determiner of what constitutes an extraordinary and compelling reason, the amendment's allowance of defendants' own § 3582(c)(1)(A) motions for reduction of sentence would be to no avail. Such a reading would contravene the explicit purpose of the new amendments.*

Cantu, 423 F. Supp. 3d at 350-51(internal citations and quotations omitted) (emphases added).

The Court concluded:

---

[23] "Appropriate use" is the language used in 28 U.S.C. § 994(a)(2)(C), set forth at note 19, *supra*.

> Thus, the correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements "at any time"—is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief.

Id. at 352 (quoting, Mistretta v. United States, 488 U.S. 361, 394 (1989)).

In following the reasoning of Cantu—as many cases (about to be discussed) have done—this Court emphasizes, as Cantu expressed, that this is an "holistic endeavor that must consider the entire statutory scheme," that the Court's role is "to make sense rather than nonsense out of the corpus juris," and that the *latest* enacted statute and its express purpose must be the keystone.

Since Cantu was issued in June 2019, at least twelve other federal district courts of which this Court is aware have considered the relationship between the FSA-amended compassionate release statute and Application Note 1(D) and have reached essentially the same conclusion as Cantu.  See United States v. Brown, 411 F. Supp. 3d 446, 450 (S.D. Iowa Oct. 8, 2019) ("the Court concludes [that] the Cantu, Fox, and Beck courts' reading of § 3582 better comports with the FSA's purpose, congressional intent with amending § 3582(c), and the most natural reading of the statutory scheme");[24] United States v. Urkevich, 2019 WL 6037391, at *3 (D. Neb. Nov.

---

[24] Beck and Fox were issued shortly after Cantu.  See United States v. Beck, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019) ("There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act."); United States v. Fox, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts.").

Brown also engaged in its own plenary reasoning, concluding: "If the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.  Unqualified deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role….Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." 411 F. Supp. 3d at 451 (internal quotations and citations omitted).

14, 2019), app. docketed, No. 20-1603 (Mar. 23, 2020) ("[T]this Court may use Application

Note 1(D) as a basis for finding extraordinary and compelling reasons to reduce a sentence,"

citing Beck, Fox, Cantu[25] and Brown);  United States v. Ebbers, __ F. Supp. 3d __, 2020 WL

91399, at *4 & n. 6 (S.D.N.Y. Jan 8, 2020) (observing, first, that "U.S.S.G. § 1B1.13's

descriptions of 'extraordinary and compelling reasons' remain current, even if references to the

identity of the moving party are not," and then holding in a footnote, "On the other hand, because

no statute directs the Court to consult the BOP's rules or guidelines…the Court finds the BOP

Guidelines to be inapposite" and that "'[T]he terms of the First Step Act give courts independent

authority to grant motions for compassionate release and says nothing about deference to BOP,

thus establishing that Congress wants courts to take a *de novo* look at compassionate release

motions'") (quoting Beck, 2019 WL 2716505 at *12)[26]; United States v. Schmitt, 2020 WL

---

[25] Ironic in hindsight is the Cantu court's observation, in closing, that "[t]he Court's determination in this case is narrow and unlikely to have far-reaching implications, as Government non-opposition is both the touchstone of the determination and rare." 423 F. Supp. 3d at 353 n.9.   The comment is perhaps also inexact: the government did *not* agree with the Court's analysis of the relationship between the First Step Act amendment to §3582(c) and Application Note 1(D) to Guideline 1b1.13: indeed, the government argued that the prisoner's motion should not even be treated as arising under 3582(c).  Instead, the government did not oppose his release as "an eligible elderly offender who qualifies for the Family Reunification Program."  Id.

[26] Especially important to the Court in Ebbers was the Congressional objective in amending §3582(c): in the Court's words, "Congress has made the legislative judgment to increase the use of compassionate release. The section's title … unambiguously states as much.").  Id., 2020 WL 91399, at *3.  Ebbers further notes that "Congress passed the compassionate release amendments amid sustained critique of the BOP's program and failed attempts to reform it," and that, until 2013, "on average, only 24 inmates were released each year through the BOP program from a federal prison population of approximately 220,000." Id. (internal quotations and citations omitted).  Following an Inspector General report in 2013, "the BOP reformed its policies, and instances of compassionate release increased to eighty-three inmates between August 2013 and September 2014. . . . But because Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient." Id. (internal quotations and citations omitted).

96904, at *3 (N.D. Iowa Jan. 8, 2020) (lodging agreement with <u>Cantu</u>, <u>Beck</u>, <u>Fox</u>, <u>Brown</u>, and

<u>Urkevich</u>); <u>United States v. Maumau</u>, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) ("[T]his

court joins the majority of other district courts . . . in concluding that. . . [u]nder the First Step

Act, it is for the court, not the Director of [BOP], to determine whether there is an 'extraordinary

and compelling reason' to reduce a sentence");[27] <u>United States v. O'Bryan</u>, 2020 WL 869475, at

*2 (D. Kansas Feb. 21, 2020) ("In the wake of the First Step Act, numerous courts have

recognized [that] the court can determine whether extraordinary and compelling reasons exist to

modify a sentence—and may do so under the 'catch all' provision similar to that recognized in

[Application Note 1(D)]"); <u>United States v. Young</u>, 2020 WL 1047815 at *6 (M.D. Tenn. Mar.

4, 2020) ("a majority of the district courts that have considered the issue have likewise held,

based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the

court's independent finding of extraordinary or compelling reasons");[28] <u>United States v. Redd</u>,

2020 WL 1248493, at * 7 (E.D. Va. Mar. 16, 2020) (concluding that "[a]pplication Note 1(D)'s

---

[27] In a footnote, the Court in <u>Maumau</u> "briefly notes that, in reaching this conclusion, its
reasoning is slightly different from some of the other district courts cited above.  A few of those
cases frame the First Step Act as shifting discretion from the Bureau of Prisons Director to the
district courts…. But in this court's view, the district courts have always had the discretion to
determine what counts as compelling and extraordinary.  The courts have never been a rubber
stamp for compassionate release decisions made by the Bureau of Prisons. … The key change
made by the First Step Act is not a redistribution of discretion, but the removal of the Director's
role as a gatekeeper.  Before the First Step Act, the Director's role limited the number of cases
the courts saw and, by extension, limited the number of instances in which the courts exercised
their discretion to determine what counted as an extraordinary and compelling reason to modify a
sentence.  Because prisoners may now file motions directly, courts will address this issue more
frequently.  But this is not a new grant of discretion; it is merely an increased opportunity to
exercise that discretion." <u>Id.</u> at n. 5.

[28] Apparently in <u>Young</u>, unlike here, the government conceded that Guideline 1B1.13 and its
commentary are no longer binding.  <u>See id.</u> 2020 WL 1047815, at *6 ("The government also
concedes that, because the Sentencing Commission's policy statement 'has not been amended to
reflect [the changes made by the First Step Act],' the statement provides 'helpful guidance' but
... is not ultimately conclusive given the statutory change.'").

27

prefatory language, which requires a determination by the BOP Director, is, in substance, part

and parcel of the eliminated requirement that relief must be sought by the BOP Director in the

first instance" and therefore "joins other courts in concluding that a court may find, independent

of any motion, determination or recommendation by the BOP Director, that extraordinary and

compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G.

§ 1B1.13 cmt. n.1(A)-(C)"); United States v. Owens, 97 CR-2546, ECF No. 93 at *4 (S.D. Cal.

Mar. 23, 2020) (following "numerous courts [that] have recognized the court can determine

whether extraordinary and compelling reasons exist to modify a sentence—and may do so under

the 'catch-all' provision"); United States v. Decator, 2020 WL 1676219, at *2-3 (D. Md. Apr. 6,

2020) (following, *inter alia,* Beck, Young, and Redd, concludes that, "[w]hile Sentencing

Commission and BOP criteria remain helpful guidance, the amended § 3582(c)(1)(A)(i) vests

courts with independent discretion to determine whether there are 'extraordinary and compelling

reasons' to reduce a sentence same").[29]

These decisions reflect, to borrow a term, the right side of history on the crucial legal

questions they consider, which Haynes's motion also presents, and so today this Court joins them

in concluding that it, too, has the authority to grant the relief sought in this case—namely, to

determine what "Other Reasons" (as that term is used in Application Note 1(D)) qualify as

---

[29] The principle outlier of which this Court is aware, and the sole authority relied on by the government here, is United States v. Lynn, 2019 WL 3805349 (S.D. Ala. Oct. 8, 2019). There, the Court concluded that as long as 28 U.S.C. § 994 continued to instruct the Sentencing Commission to promulgate policy statements defining "extraordinary and compelling," the most recent policy continued to govern. The court reasoned that "[i]f the policy statement needs tweaking ..., that tweaking must be accomplished by the Commission, not by the courts." Id. at *4. Brown and Maumau, among others of the cases cited above, critique Lynn and decline to follow it principally because it conflicts with the Congressional goal of increasing the use and transparency of compassionate release.

"extraordinary and compelling" regardless of BOP's view on the matter and without having to

await a someday-updating by the Commission of its unquestionably outdated policy statement.

> **2.      The Extraordinary and Compelling Circumstances
> Here Warranting a Reduction in Sentence**

The Court readily concludes, on the facts as detailed above—including the brutal impact

of Haynes's original sentence, its drastic severity as compared to codefendant Rivers's ten-year

term, its harshness as compared to the sentences imposed on similar and even more severe

criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's

exercise of his constitutional right to trial—that the FSA' elimination of the § 924(c) sentencing

weaponry that prosecutors employed to require that sentence is an extraordinary and compelling

circumstance warranting relief under § 3582(c).  For an individual like Haynes, with three pre-

amended § 924(c) counts in a single indictment, the change spells the difference between thirty

years in or out of prison.

Indeed, several of the reported decisions just catalogued have made precisely that finding

with respect to similarly situated defendants, holding that this sea change in § 924(c) law,

coupled with the brutal impact of the original sentence, is an extraordinary and compelling

circumstance warranting a reduction in sentence under the compassionate release statute.  A

recent example is Redd, from the Eastern District of Virginia, which involved a § 924(c) bank

robbery defendant sentenced to just over 50 years, 45 of which were for his three stacked §

924(c) convictions.  The Court concluded:

> There is no doubt that there is gross disparity between the sentence Mr. Redd
> received and the sentence he would have received after the First Step Act….That
> disparity is primarily the result of Congress'[sic] conclusion that [stacked]
> sentences are unfair and unnecessary, in effect a legislative rejection of the need
> to impose sentences under § 924(c) as originally enacted, as well as a legislative
> declaration of what level of punishment is adequate … These are, the Court finds,

extraordinary and compelling developments that constitute extraordinary and compelling reasons that warrant a reduction to [the defendant's] sentence.

Redd, 2020 WL 1248493, at *6.[30]  Incorporating its analysis of the effect of the FSA-amended statute on the existing Guideline commentary, the Redd Court further found that "the [circumstances] that it has determined … [to be] extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any *applicable* policy statement." Id. (emphasis added).

Other cases reaching the same result before Redd include Urkevich, 2019 WL 6037391, at *4 ("A reduction in … sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed");[31] Maumau, 2020 WL 806121, at *7 ("Like the Urkevich court, this court concludes that the changes in how § 924(c) sentences are calculated is a compelling and extraordinary reason to provide relief on the facts present here," which also included "[the defendant's] young age at the time of the sentence [and] the incredible length of the mandatory sentence imposed");[32] and O'Bryan, 2020 WL 869475, at *2 (framing the legal

---

[30]  At the time the defendant in Redd moved for compassionate release he had served more than 23 years; the Court reduced his sentence to allow for his immediate release.

[31] The defendant in Urkevich was convicted after trial of several drug trafficking crimes and three § 924(c) counts and sentenced, in 2004, to 235 months on the drug count and to a total of 55 years on the three §924(c) counts (5, 25 and 25).

[32] Maumau also squarely rejects another principal objection raised by the government in opposition in these cases, namely, that, even accounting for the presence of the catch-all "other reasons" in Application Note 1(D), traditionally compassionate release is a remedy for physical limitations due to age or medical condition and the like, *not* sentence length—for which the law provides other vehicles of relief.

As Maumau documents, however, there are explicit indicators to the contrary in the legislative history of the statute that first created compassionate relief and made BOP its gatekeeper.  See Pub. L. No. 98-473, 98 Stat. 1837 (Comprehensive Crime Control Act of 1984, eff. Oct. 12, 1984)  In the Senate Report accompanying that Act, Congress expressed its belief that §3582(c)

30

question as, "[d]oes the FSA's modification of the § 924(c) sentencing regime constitute an

'extraordinary and compelling reason' for a sentencing reduction?", the court follows Maumau

and Urkevich, answers in the affirmative).  See also Brown, 411 F. Supp. 3d at 453 ("district

court assessing a compassionate release motion may still consider the resulting sentencing

disparity" caused by the First Step Act's changes to § 924(c); denying motion, however, because

the requested sentence reduction would not have resulted in prisoner's immediate release; court

urged Holloway relief instead).[33]

---

modifications would be appropriate in "cases of severe illness" as well as two situations relating
to sentence length: "cases in which *other extraordinary and compelling circumstances justify a
reduction of an unusually long sentence*," and "cases in which the *sentencing guidelines for the
offense of which the defender was convicted have been later amended to provide a shorter term
of imprisonment*."  S. Rep. No. 98-225, at 55-56 (1984) (emphases added).

Maumau further observes: "Despite this intent, a 2013 Inspector General's report by the
Department of Justice found that 'although the BOP's regulations and Program Statement permit
non-medical circumstances to be considered as a basis for compassionate release, the BOP
routinely rejects such requests and did not approve a single nonmedical request during the 6-year
period of our review.'"  Maumau, 2020 WL 806121, at *5 (citing the Department of Justice's
April 2013 report, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii).

The Court in Maumau concludes:

> In other words Congress indicated [35] years ago that it would be appropriate to
> provide compassionate releases when sentences are "unusually long" but the
> [BOP] consistently declined to seek relief in those situations.  Congress responded
> by eliminating the [BOP]'s gatekeeping function over compassionate releases.
> Accordingly, the fact that the phrase "extraordinary and compelling reason" has
> not historically been interpreted to include exceedingly long sentences is an
> unpersuasive reason to exclude such an interpretation today.

Id.

[33] Since Redd, at least two more decisions of which this Court is aware have granted motions for
compassionate release on these same grounds.  See Owens, 97 CR-2546, ECF No. 93 at *5
(agreeing with "[n]umerous district courts [that] have considered the exact argument and held
that the First Step Act's change in how sentences should be calculated when multiple §924(c)
charges are included in the same indictment constitutes extraordinary and compelling reasons
under 18 U.S.C. § 3582(c)(1)(A)"); Decator, 2020 WL 1676219, at *4 ("the court finds that [the
defendant's] continued incarceration under a sentencing scheme that has since been substantially

Of final note, the <u>O'Bryan</u> decision, among others, specifically addresses the other principal objection raised by the government here and in other § 924(c) compassionate-release cases, namely, that granting relief because of the transformative change in the § 924(c) sentencing scheme ushered in by the First Step Act would run counter to Congress's decision not to make that change retroactive.  The Court reasoned:

> Notably, the only rationale offered by the government for opposing the relief sought is the contention that Congress did not specify that Section 403 of the FSA [amending 18 U.S.C. § 924(c)] should apply retroactively. … However, this simply establishes that a defendant sentenced before the FSA is not automatically entitled to resentencing; it does not mean that the court may not or should not consider the effect of a radically changed sentence for purposes of applying § 3582(c)(1)(A).  That is, the fact that the FSA changes in § 924(c) were not explicitly retroactive is "relevant [but] ultimately has little bearing" on whether the court is empowered to act under Section 3582, because "[i]t is not unreasonable for Congress to conclude that not all defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve some defendants of those sentences on a case-by-case basis."

<u>O'Bryan</u>, 2020 WL 869475, at *1 (quoting, <u>Maumau</u>, 2020 WL 806121, at *7).

Indeed, this Court would add: the Congressional decision not to make the § 924(c) change retroactive spares the courts an avalanche of applications and inevitable re-sentencings, no doubt in many cases that do not feature the same grave characteristics presented here.

In sum, in the context of the prosecution of Haynes detailed above, the Congressional decision to outlaw the very weapon prosecutors used to punish Haynes with 30 additional years in prison for electing to go to trial—and to reiterate: as documented in the plea offer letter, the quid pro quo was explicit—is an "extraordinary and compelling" circumstance warranting a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  It also bears repeating: although the

---

amended is a permissible "extraordinary and compelling" reason to consider him for compassionate release").

First Step Act's amendment of 18 U.S.C. § 924(c) was not made retroactive, the amendment was titled "Clarification of Section 924(c)."  What happened to Mr. Haynes is something Congress has now made clear should never have occurred.

### 3.    18 U.S.C. § 3553(a) and 3142(g) Considerations

Only two steps remain.  First, to comply with the applicable policy statement found at Guideline § 1B1.13(2), the Court must be satisfied that Haynes "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).  If the Court so finds, it must then "consider[] the factors set forth in section 3553(a) to the extent they are applicable," 18 U.S.C. § 3582(c)(1)(A), to determine the appropriate sentence.

The government insists that Haynes would pose a danger to the community if released now, and therefore should serve the remaining 13 years of his sentence, because (a) the crimes he committed in 1992 were crimes of violence, and, (b) as detailed above, he was disciplined on March 29, 2010, for "possessing a dangerous weapon," and again on July 9, 2015, for "unauthorized physical contact."

The Court strongly disagrees.  Indeed, refuting the government's recidivism argument is, again, the fact that the Congress has now decided that Haynes has served more than the appropriate sentence for his crimes.  Whatever speculative risks of recidivism exist here are no greater than for any defendant who has served the time the legislature has decreed for the crimes committed.

Beyond that, despite how the government might seek to characterize Haynes's prison records, the BOP Summary Reentry Report described above plainly shows that Haynes has been

a good prisoner and then some, having completed hundreds of hours of coursework and having discharged his job duties impressively.  The 2010 and 2015 disciplinary incidents highlighted by the government are simply not proof that Haynes would be a danger to society.  In any event, with respect to the most recent incident of unauthorized contact in 2015, the explanation Haynes has offered—which the government has not refuted—establishes the very opposite of dangerousness.  It shows altruism, even heroism, certainly qualities society could use more of, not less.[34]

Section 3553(a) requires little additional discussion.  The Congressional declaration of what is now considered adequate punishment for violations of 18 U.S.C. § 924(c) necessarily satisfies the Section 3553(a) mandate to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which in turn requires that a sentence "reflect the seriousness of the offense" and "provide just punishment for the offense." Congress had made clear that what Haynes has already served fully discharges these critical sentencing objectives.  The only point of arguable contention concerns § 3553(a)(2)(C)—the need "to protect the public from further crimes of the defendant"—which is duplicative of the question of dangerousness for purposes of Section 3142(g) just discussed.

**CONCLUSION**

To conclude, one might well begin with the words of Haynes's counsel, who are to be commended for their persistence and for the remarkably high quality of their submissions.

---

[34] As for the 2010 incident, the Court has no information as to the circumstances.  In any event, the fact that Haynes admitted having a knife in his cell a full decade ago simply does not speak to the question of future dangerousness.   Finally, the government argues that Haynes's motion should be denied because his plans upon release are too vague.  This argument is frivolous in light of the detailed submission from the Federal Defenders social work team described above.

The sentence in this case shames us all.  It was the result of an unjust and retaliatory sentence enhancement that has now been eliminated because of its excessive harshness and its history of disproportionate use against Black men like Mr. Haynes.  Mr. Haynes has already served nearly two decades in prison solely for exercising his constitutional right to trial by jury.  The relief requested here is urgent.

As this order is signed, Haynes will have been in federal custody for almost 27 years as a result of his only foray into serious criminal behavior.  Those years, as discussed, are far beyond what the United States Attorney determined was a suitable sentencing range when offering Haynes a plea, far beyond what Congress ever intended, as its recent clarification makes clear, and far beyond what the law now permits.  And all because Haynes chose a trial over a plea and the prosecution retaliated, an action that the United States Attorney concedes could not be taken today.

The insistence of this first-time offender on a trial was no doubt ill-advised, more likely foolish in light of the available evidence and the government's distinct advantage in trying four robberies in a single trial.  But it was his decision, and a choice firmly guaranteed by the Constitution.  Although the government cannot be faulted for Haynes's poor judgment in making that election, the prosecution's plainly retaliatory reaction reflects patently flawed judgment and insensitive abuse, on its part, of the powers with which it is vested.

Congress has spoken.  Loudly.  It has clarified its intended deployment of § 924(c) and expressly outlawed the stacking option responsible for Haynes's incarceration today.  The government, however, remains disturbingly comfortable in its position and unaccountably indifferent to the impact of the now banned practice on Haynes's life.  Sadly, it resists exercising its power to correct this obvious wrong and grave injustice.  So the Court must.

For all of the foregoing reasons, defendant Kevin Haynes' motion for a reduction in sentence is granted, and the sentence is reduced to time-served.  The pending motion for relief under Fed. R. Crim. P. 48 is denied without prejudice.

The Clerk of the Court is directed to prepare the appropriate amended judgement.

SO ORDERED.


Dated: Brooklyn, New York
       April 22, 2020

                                          /S/ Raymond J. Dearie
                                          RAYMOND J. DEARIE
                                          United States District Judge